**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 2, 2003**

ANN E. MASKERY and ROBERT
MASKERY,

    Plaintiffs-Appellees,

v                            No.  121338

BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN,

    Defendant-Appellant.
_____

BEFORE THE ENTIRE BENCH

CORRIGAN, C.J.

    We granted leave to appeal to consider whether a continuously locked residence hall at a public university was "open for use by members of the public" under the public-building exception to governmental immunity, MCL 691.1406. We hold that the residence hall was not "open for use by members of the public." We thus reverse the judgment of the Court of Appeals and reinstate the trial court's order granting summary

disposition for defendant.

### I. Underlying facts and procedural posture

Plaintiff's[1] daughter, a college student, resided at the Betsy Barbour Residence Hall on the University of Michigan's Ann Arbor campus. The residence hall was locked twenty-four hours a day. A courtesy telephone outside the entrance to the building was available for visitors to call a resident and request admittance. The phone is located at the top of a short stairway at the building's entrance. After using the courtesy phone, plaintiff lost her balance and fell down the stairs, injuring herself.

Plaintiff sued the university, claiming that the placement of the courtesy phone near a narrow step created a dangerous and defective condition. She attempted to avoid governmental immunity on the basis of the public-building exception, MCL 691.1406. Defendant moved for summary disposition under MCR 2.116(C)(7) ("The claim is barred because of . . . . immunity granted by law . . . ."). Defendant argued that the residence hall was not open for use by members of the public. Defendant presented an affidavit establishing that the residence hall was locked twenty-four hours a day. Visitors could gain access only by using the

---

[1]We refer to plaintiff Ann Maskery as "plaintiff." Robert Maskery's claim is derivative of his wife's claim.

2

courtesy phone to contact a resident, who then could unlock the door to allow entry. The trial court granted defendant's motion.

On its initial review, the Court of Appeals affirmed.[2] The Court cited cases holding that public-housing facilities were not open for use by members of the public. See *Griffin v Detroit*, 178 Mich App 302; 443 NW2d 406 (1989); *White v Detroit*, 189 Mich App 526; 473 NW2d 702 (1991).

This Court remanded the case to the Court of Appeals for reconsideration in light of *Horace v City of Pontiac*, 456 Mich 744; 575 NW2d 762 (1998). 459 Mich 944 (1999). On remand, the Court of Appeals again affirmed[3] because the residence hall was indistinguishable from the public housing in *Griffin* and *White*. The Court noted that access to the entire building was limited to residents, guests admitted by the residents, and maintenance personnel. The Court also held in light of *Horace* that the steps on which plaintiff fell were not part of the residence hall.

This Court then remanded the case to the Court of Appeals a second time for reconsideration in light of *Brown v Genesee Co Bd of Comm'rs*, 464 Mich 430; 628 NW2d 471 (2001), and *Fane*

---

[2]Unpublished order, entered February 10, 1997 (Docket No. 187738).

[3]Unpublished opinion per curiam, issued March 24, 2000 (Docket No. 187738).

*v Detroit Library Comm*, 465 Mich 68; 631 NW2d 678 (2001). 465 Mich 806 (2001). On the second remand, the Court of Appeals reversed the order granting summary disposition.[4] The Court discussed the statement in *Brown* that a jail was open for use by members of the public and concluded that the residence hall was also open for use by members of the public. Applying *Fane*, the Court of Appeals concluded that the steps where plaintiff fell were part of the residence hall.

Defendant filed an application for leave to appeal. We granted the application "limited to the question of whether the university dormitory at which plaintiff was injured is 'open for use by members of the public' within the meaning of MCL 691.1406."[5] 467 Mich 887 (2002).

## II. Standard of review

We review de novo a trial court's ruling on a motion for summary disposition. *Hinkle v Wayne Co Clerk*, 467 Mich 337, 340; 654 NW2d 315 (2002). "MCR 2.116(C)(7) tests whether a claim is barred because of immunity granted by law, and requires consideration of all documentary evidence filed or

---

[4]Unpublished opinion per curiam, issued January 11, 2002 (Docket No. 187738).

[5]Defendant did not seek leave to appeal on whether the steps on which plaintiff fell were part of the public building. Thus, we do not reach that issue. We also do not address whether plaintiff has established a dangerous or defective condition of a public building.

4

submitted by the parties." *Glancy v Roseville*, 457 Mich 580, 583; 577 NW2d 897 (1998).

### III. Discussion

### A. Governmental immunity and the public-building exception

Absent a statutory exception, a governmental agency is immune from tort liability when it exercises or discharges a governmental function. MCL 691.1407(1). A governmental function is "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1401(f). The term "governmental function" is to be broadly construed, and the statutory exceptions are to be narrowly construed. *Horace*, *supra* at 749.

It is not disputed that defendant has authority to construct dormitories for student housing. MCL 390.16 permits the Board of Regents of the University of Michigan to "erect from time to time, such buildings as are necessary for the uses of the university, on the grounds set apart for the same . . . ."

The public-building exception to governmental immunity, MCL 691.1406, provides:

> Governmental agencies have the obligation to repair and maintain public buildings under their control *when open for use by members of the public*. Governmental agencies are liable for bodily injury and property damage resulting from a dangerous or defective condition of a public building if the

5

governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or take action reasonably necessary to protect the public against the condition. . . . [Emphasis added.]

Thus, "[t]o come within the narrow confines of this exception, a plaintiff must prove that (1) a governmental agency is involved, (2) the public building in question was open for use by members of the public, (3) a dangerous or defective condition of the public building itself exists, (4) the governmental agency had actual or constructive knowledge of the alleged defect, and (5) the governmental agency failed to remedy the alleged defective condition after a reasonable period or failed to take action reasonably necessary to protect the public against the condition after a reasonable period." *Kerbersky v Northern Michigan Univ*, 458 Mich 525, 529; 528 NW2d 828 (1998) (emphasis omitted), interpreting MCL 691.1406. The second element is at issue here, i.e., whether the locked residence hall was open for use by members of the public.

### B. Summary of case law

A review of case law in this area offers guidance.[6] In *Dudek v Michigan*, 152 Mich App 81; 393 NW2d 572 (1986), a state mental-health facility was being renovated. A

---

[6]A helpful summary of case law may also be found in *Kerbersky, supra.*

6

construction worker was injured when a cement block fell from a building. The Court of Appeals held that the public-building exception did not apply because the entire construction area was closed off by a fence, and only authorized personnel could enter.

In *Griffin*, *supra*, a resident of a public-housing facility drowned in her bathtub. The Court of Appeals held that the public-building exception did not apply because the dwelling unit "was not open for use by members of the public. It was open for use by the decedent as her private residence under the lease agreement." *Id*. at 306.

In *Taylor v Detroit*, 182 Mich App 583; 452 NW2d 826 (1989), a boy was electrocuted after breaking into a locked electrical substation in an abandoned section of a public-housing project. The Court of Appeals held that the substation was not open for use by members of the public. "Here, only authorized personnel were allowed entry into the substation; the structure was neither designed nor intended to be accessible to or used by the general public." *Id*. at 588.[7]

In *White*, *supra*, a resident of a public-housing facility was injured on a patio at the facility. The plaintiff

---

[7]In *Kerbersky*, *supra*, this Court approved the result in *Taylor* but noted that "[t]he word 'general' is not in the statute and therefore should not be read into the statute." *Id.* at 534.

7

attempted to distinguish *Griffin* on the ground that the accident in *White* occurred in an area accessible to the public rather than in a tenant's private residence. The Court of Appeals rejected that distinction:

> Because the building in the instant case was a residential housing facility containing private housing units, and was not a building used for public offices or for a public purpose, the public building exception does not apply. And the area at issue, being adjacent to a nonpublic building, does not fall within the exception merely because the area may be accessible by the public. [*Id.* at 529.]

In *Steele v Dep't of Corrections*, 215 Mich App 710; 546 NW2d 725 (1996), a prison inmate was injured while he was part of a work crew renovating a state building. The Court of Appeals concluded that the public-building exception did not apply because the building was not open to the public during renovations.

In *Kerbersky*, *supra*, a construction worker fell from a ladder while renovating a university administration building. This Court held that the building was open for use by members of the public, even though the specific accident site was closed for renovations. This Court stated, however, that where an *entire* building is closed for renovations, it is not open for use by members of the public. This Court therefore endorsed the holdings in *Dudek* and *Steele*.

The *Kerbersky* Court agreed with the result in *White*

8

because areas adjacent to public buildings are not covered by the exception. Also agreeing with the holding in *Griffin*, the *Kerbersky* Court stated: "A tenant who is present in a city-owned apartment as the result of an oral or written lease is not using the building *as a member of the public*; rather, such a person has a contractual possessory interest in the apartment." *Id*. at 535 (emphasis added). This Court further approved the *Taylor* holding that the locked electrical substation was not open for use by members of the public.

Next, in *Brown v Genesee Co Bd of Comm'rs (After Remand)*, 464 Mich 430; 628 NW2d 471 (2001), an inmate injured himself in the shower area of a jail. A majority of this Court concluded that a jail inmate is not a member of the public for the purposes of the public-building exception to governmental immunity as that relates to a jail.

### C. Analysis

We reaffirm that mere public ownership of a building is insufficient to meet the requirements of the public-building exception. The statute makes plain that governmental agencies owe a duty to repair and maintain "public buildings under their control *when open for use by members of the public*" (emphasis added). If mere public ownership sufficed, the phrase "when open for use by members of the public" would be rendered nugatory. Courts must avoid a construction that

9

renders part of a statute nugatory. *Brown*, *supra* at 437, citing *People v Borchard-Ruhland*, 460 Mich 278, 285; 597 NW2d 1 (1999).

To determine whether a building is open for use by members of the public, the nature of the building and its use must be evaluated. The government, of course, controls the use that will be made of its buildings. If the government has restricted entry to the building to those persons who are qualified on the basis of some individualized, limiting criteria[8] of the government's creation, the building is not open to the public. This test arises from the plain statutory language. If access to a building is limited in the manner we have described, members of the public may not freely enter, and the building is not open for use by members of the public.[9]

---

[8]Such limiting criteria would not include universal requirements such as possession of a ticket, as for an athletic or theatrical event, or the need to universally bar entry to those with weapons, such as at courthouses or other secure, but public, facilities.

[9]The test that we have set forth should not be confused with the following discussion of "limited access" in *Kerbersky*:

As noted in *Steele*, the public building exception can apply to buildings with limited access. For example, this Court's handling of *Bush v Oscoda Area Schools*, 405 Mich 716; 275 NW2d 268 (1979), demonstrates that the building in question does not have to be open to members of the general public to come within the statute. In *Bush*, we

10

This test focuses on whether the government intends to limit the public's access to the building—a breach of the rules limiting entry would not render the building open to the public. Where a person who is not qualified for entry nonetheless gains access, the government remains entitled to immunity.

---

held that the public building exception applied to an injury sustained in a high school chemistry class. Very few people could legitimately have been in this classroom. This particular classroom was not accessible by members of the *general* public. [*Kerbersky, supra* at 534.]

The phrase "limited access" was used in *Kerbersky* to explain that where access *to part of a building* is limited, the public-building exception may still apply if the building remains open for use by members of the public. Here, the concept of limited access is used in a different sense, i.e., to describe a building in which access *to the entire building*, or the general right of entry, is restricted to persons who are qualified to enter. Where the government has created rules that render the building closed except to those who are qualified to enter, the building is not open for use by members of the public. The focus of the test is on the government's intended use of the building. Thus, the test set forth in this case should not be confused with the language in *Kerbersky* clarifying that a building may be open to the public even though access to a part of the building is limited.

In other words, the *Kerbersky* holding and the test we announce here address distinct questions that may arise in a court's analysis under the public-building exception. *Kerbersky* clarifies that a building may be "open for use by members of the public" even where a location within the building is restricted from public use. The present case, however, involves a building that is not open for use by the public because access to the entire building is limited in the manner we have described. Where, as here, the entire building is closed to the public, the holding in *Kerbersky*, concerning a building that remains open despite containing a location that is restricted to the public, simply is not implicated.

Moreover, the statutory language makes clear that the public-building exception applies *when* the building is open for use by members of the public. A building such as a courthouse that is open to the public during business hours may nonetheless be *closed* to the public at other times, such as at night or on weekends. Similarly, a university athletic facility may be open to the public during a sporting event, but closed to the public at other times. Because the statutory language limits the exception to periods *when* the building is open for use by members of the public, accidents that occur when the building is closed to the public do not fall within the confines of the exception, and the government is entitled to immunity.

The residence hall in this case was not open for use by members of the public. Members of the public could not enter the building without using a courtesy phone to contact a resident and asking the resident to unlock the door. In that manner, the university restricted entry to the residence hall to those persons who were qualified on the basis of individualized, limiting criteria—in this case, permission from a tenant. Accordingly, the building was not open to the public.[10]

_____

[10]The Court of Appeals determined that the delivery of supplies, mail, and food by nonresidents rendered the residence hall open for use by members of the public. In

12

## IV. Conclusion

The Betsy Barbour Residence Hall was not open for use by members of the public. Accordingly, plaintiff has not satisfied the requirements of the public-building exception, and defendant is immune from tort liability. We reverse the judgment of the Court of Appeals and reinstate the trial court's order granting summary disposition for defendant.

Maura D. Corrigan
Elizabeth A. Weaver
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

CAVANAGH, J.

I concur in the result only.

Michael F. Cavanagh

---

reaching this conclusion, the Court of Appeals relied on dicta in *Brown* discussing deliveries to a jail. The *Brown* plurality opinion should not be read to suggest that mere deliveries are sufficient to render a building open for use by members of the public. The Court of Appeals erred in relying primarily on this dicta from *Brown*. Instead, as our opinion today explains, the appropriate test for determining whether a building is open for use by members of the public is whether entry to the building has been restricted on the basis of some individualized, limiting criteria. This analysis requires consideration of the use of the particular building involved.

Our dissenting colleague also attempts to apply dicta from the *Brown* plurality opinion to this case and questions whether a jail may be open for use by members of the public while the residence hall here is not. The central holding in *Brown*, however, concerned whether an inmate was a member of the public. We decline to revisit issues that are not before us. We are confident that the test we have set forth is derived from the statutory text and supports the result we have reached.

13

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

ANN E. MASKERY and ROBERT
MASKERY,

    Plaintiffs-Appellees,

v                                 No. 121338

BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN,

    Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

I respectfully dissent.  In its decision, the majority creates a test that can be used to discern whether a building is open for use by members of the public under MCL 691.1406. However, I find that the test is unclear.

Moreover, I believe that the Court of Appeals did not clearly err in its decision on remand, given our explicit directive to it to apply the holding in *Brown*.  The Court of Appeals construed *Brown* in the only way possible.  Also, like the Court of Appeals, I am unable to distinguish the residence

hall in this case from the jail in *Brown* when applying the *Brown* test.

## I.  THE COURT OF APPEALS DID NOT CLEARLY ERR

A brief examination of the cases interpreting MCL 691.1406 reveals that no adequate method has been established to determine when a building is open for use by members of the public.  This is underscored by the fact that the Court of Appeals has decided this case three times and, now, for the third time, is told it did not correctly interpret § 6.

### A.  The *Brown* decision

In *Brown v Genesee Co Bd of Comm'rs (After Remand)*,[1] the Court devoted a few paragraphs to discussing whether a jail is open for use by members of the public under § 6:

> Plaintiff claims to have injured himself near a shower stall in defendant's jail.  Under *Kerbersky*, we examine the public's access to *the jail* rather than the shower area.  [*Kerbersky v Northern Michigan Univ*, 458 Mich 525; 582 NW2d 828 (1998).]

> *Green v Dep't of Corrections*, 386 Mich 459; 192 NW2d 491 (1971), held that a jail falls within the scope of the statutory exception.  In other decisions, this Court has implicitly assumed as much.  See, e.g., *Wade v Dep't of Corrections,* 439 Mich 158; 483 NW2d 26 (1992).

> We would reaffirm that a jail is open for use by members of the public.  Family, friends, and attorneys may generally visit inmates.  Members of the public may also enter a jail for other reasons, e.g., to apply for a job or make a delivery.

---

[1]464 Mich 430, 435-436; 628 NW2d 471 (2001).

2

The fact that public access to a jail is limited does not alter our conclusion. Schools fall within the exception even though members of the public may not enter whenever and wherever they please. *See Sewell v Southfield Public Schools*, 456 Mich 670; 576 NW2d 153 (1998); *Bush v Oscoda Area Schools*, 405 Mich 716; 275 NW2d 268 (1979). The public building exception applies to buildings with limited access, including schools and prisons. *Kerbersky, supra* at 534; *Steele v Dep't of Corrections*, 215 Mich App 710, 715; 546 NW2d 725 (1996). [Emphasis in original.]

Analyzing this discussion, one finds that there are two discernible approaches to concluding why a jail is open for use by members of the public. First, the Court could be following the analysis suggested in *Green*. However, the opinion tells us that it does "not approve the reasoning in that decision." *Brown, supra* at 436 n 4.

Next, the second paragraph states that a jail might be open for use by members of the public because "[f]amily, friends, and attorneys may generally visit inmates. Members of the public may also enter a jail for other reasons, e.g., to apply for a job or make a delivery." The third paragraph tells the reader that "limited access" to a building like a jail does not preclude its being open for use by members of the public.

Therefore, the reader is given two possible reasons that a jail is open for use by members of the public, then told not to rely on the first one. The logical conclusion is that the

3

second reason given is the reason the jail is "open."

Notably absent from *Brown* is any description of the jail in question.  Does it have an open lobby that one can enter freely?  Is there a checkpoint outside?  Is there a guarded gate?  How is it like other jails?  The answers to these questions are left to the imagination.  The reader is given the impression that *all jails are open for use by members of the public*, regardless of their structure or how they limit access.

### B.   The remand after *Brown*

After *Brown*, the Court remanded this case to the Court of Appeals for the second time, for reconsideration in light of the new decision.  The Court of Appeals attempted to apply the reasoning in *Brown*.

> Here, the building in question is not a jail, but a residence hall.  If a jail is "open for use by members of the public" by virtue of the family and friends that may visit inmates, it certainly follows that a residence hall would also be "open for use by members of the public."  Indeed, we would suspect that there is more, or at least equal, ingress and egress in a residence hall than in a jail.  Similarly, a residence hall is likely to receive deliveries of supplies, mail, and food by nonresidents.  Moreover, if the very limited access to a jail is not sufficient to preclude its characterization as a public building, the instant residence hall's minimal security measures, while presumably effective, further justify a finding that the residence hall was a public building.  Thus, we believe that the Brown decision leads only to a conclusion that the residence hall was "open for use by members of the public."  Therefore, we conclude that the residence hall was a public

4

building, as necessary to permit plaintiff's reliance on the public building exception to governmental immunity, MCL 691.1406.[2]

It is apparent that the Court of Appeals extracted the only rationale available from *Brown,* the statements about access by friends, family, and attorneys and for job applications and deliveries. It then applied that rationale to the facts. It is also apparent that the Court reasonably concluded that a jail would provide tighter security than a residence hall, locked or unlocked.

### C. The majority decision

Today, the majority reverses the Court of Appeals, even though, in light of the brief discussion in *Brown*, it would be difficult to reach another conclusion. The majority rejects the lower court's rationale in its footnote 10, *ante* at 12-13:

> The Court of Appeals determined that the delivery of supplies, mail, and food by non-residents rendered the residence hall open for use by members of the public. In reaching this conclusion, the Court of Appeals relied on dicta in *Brown* discussing deliveries to a jail. The *Brown* plurality opinion should not be read to suggest that mere deliveries are sufficient to render a building open for use by members of the public. The Court of Appeals erred in relying primarily on this dicta from *Brown*.

If the Court of Appeals erred in relying on this dicta from *Brown*, it had no choice but to err; *Brown* provides

---

[2]Unpublished opinion per curiam, issued January 11, 2002 (Docket No. 187738).

5

*nothing else on which to rely.*  Because the Court of Appeals decision was the only reasonable application of *Brown,* it was not clearly erroneous.

II. WITHOUT SPECIFIC FACTS, A "JAIL" AND A LOCKED

RESIDENCE HALL MAY BOTH HAVE RESTRICTED ENTRY

Today, the majority proposes a two-part test for determining whether a government building is open for use by members of the public under § 6.  First, there must not be "restricted entry to the building of those persons who are qualified on the basis of some individualized, limiting criteria of the government's creation."  *Ante* at 10.  Second the building must be open for public use at the time of entry.

The test is derived from the statute and arguably provides a workable framework for deciding when a building is "open" under § 6.  However, absent more facts, one cannot discern how the majority's fact-intensive inquiry concludes that "a" jail is not subject to restricted entry, while this locked residence hall is.

Initially, I would note that the majority's focus seems to have shifted from the type of building (a nonspecific "jail" in *Brown*) to the exact building at issue (Betsy Barbour Residence Hall, locked twenty-four hours a day).  *Brown* implied that all jails would be "open" for purposes of § 6, without regard to the unique aspects of each.

Today, the majority focuses on the specific aspects of this locked residence hall. Presumably, it should not be compared to one of the large residence halls at Michigan State University that are open for classes and other events during the day. However, the distinction between the generic analysis in *Brown* and the specific analysis here leads to confusion, as the majority does not disavow *Brown* at all. The bench and bar would benefit from an explanation of the proper focus for the § 6 inquiry.[3]

---

[3]Even in this case, the majority moves between general and specific focuses. For example, when discussing *Kerbersky v Northern Michigan Univ*, 458 Mich 525, 534; 528 NW2d 828 (1998), it notes that the *Kerbersky* Court reaffirmed that the public building exception would apply to "an injury sustained in a high school chemistry class . . . [even though][v]ery few people could legitimately have been in this classroom." The majority explains that this example can be distinguished from a locked residence hall because:

> The phrase "limited access" was used in *Kerbersky* to explain that where access to part of a *building* is limited, the public-building exception may still apply if the building remains open for use by members of the public. Here, the concept of limited access is used in a different sense, i.e., to describe a building in which access to the *entire building*, or the general right of entry, is restricted to persons who are qualified to enter. [*Ante* at 11 n 9 (emphasis in original.]

Again, the majority generalizes about schools. It is undisputed that in some public schools today access to the entire building, not merely to particular classrooms, is restricted. Some high schools have guards who prevent access to everyone but employees and students; most do not. Nevertheless, it is apparent that one cannot conclude that public schools in general are open for use by members of the

(continued...)

7

Next, without some comparison of the two buildings, I cannot conclude that the jail in *Brown* has less restricted entry than the residence hall in this case.  Unless the jail has an open, walk-in lobby that members of the public can enter, which is possible, I see no meaningful distinction between the levels of restriction on entry.  It seems unlikely that a member of the public could enter the interior of the jail, or this residence hall, unless he had business inside; neither building would appear to permit one to stroll at will inside the facility.[4]

Again, I emphasize that there may be aspects of the jail in *Brown* that provide for less restricted entry than the residence hall in this case.  The difficulty is that the majority does not specify what those aspects are.  The reader is left wondering, as the Court of Appeals obviously was, whether a nondescript jail is subject to fewer restrictions than this residence hall.

---

[3](...continued)
public under the proposed test.  Instead, one must consider the characteristics of a particular school.

[4]The majority notes that "[m]embers of the public could not enter the building without using a courtesy phone to contact a resident, and then asking the resident to unlock the door."  *Ante* at 12.  I imagine that a visitor to a jail would have to take at least equivalent steps to gain entry, such as passing through a guarded checkpoint.  Again, this is conjecture because the jail in *Brown* is not described.

### III. THE PROPOSED TEST IS NOT CLEARLY SET OUT

The majority's test is spread out over the two pages of analysis. The reader is left to derive the relevant principles and to make sense of them in light of the earlier cases. Because the test announced in this case should be a helpful analytic tool, I would prefer that it were more clearly articulated.

### IV. CONCLUSION

I cannot join the majority. The Court of Appeals made the only conclusion that *Brown* would support, and I find no error in it.

Marilyn Kelly

9